# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARY ANN MOYNIHAN,

    Plaintiff,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

    Defendant.

No. 14 C 10063

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Mary Ann Moynihan filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Social Security Income (SSI) under Title XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 *et seq*. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a request to reverse the ALJ's decision and remand for additional proceedings. For the reasons stated below, the Commissioner's decision is affirmed.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001).[1] A

---

[1] The regulations governing the determination of disability for Disability Insurance Benefits (DIB) are found at 20 C.F.R. § 404.1501 *et seq*. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains

person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

# II. PROCEDURAL HISTORY

Plaintiff applied for SSI on August 31, 2011, alleging that she became disabled on September 2, 2008, because of arthritis of the hip and back, depression, and anxiety. (R. at 25). The application was denied initially on January 5, 2012 and again on reconsideration. (*Id.* at 74-76). Plaintiff filed a timely request for a hearing. (*Id.* at 79-81). On May 30, 2013, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 38). The ALJ also heard testimony from Jennifer Carril, a vocational expert (VE). (*Id.*).

The ALJ denied Plaintiff's request for benefits on September 27, 2013. (R. at 17). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since August 31, 2011. (*Id.* at 22). At step two, the ALJ found that Plaintiff's arthritis of hip and back, depression, and anxiety are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 23).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that she can perform light work; specifically:

> [t]he claimant can occasionally lift and carry twenty pounds; can frequently lift and carry ten pounds; can be on her feet standing and walking for at least six hours in an eight hour workday, with normal

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

rest periods; can sit for at least six hours in an eight hour workday, with normal rest periods; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; can understand, remember, and carry out simple work instructions and execute simple workspace judgments; can perform routine work that involves occasional changes and decision making and can only occasionally interact with the general public.

(R. at 24). The ALJ determined at step four that Plaintiff has no past relevant work. (*Id.* at 29). Based on Plaintiff's RFC, age, education, and the VE's testimony, the ALJ determined at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including housekeeper, hand presser, and bench assembler. (*Id.* at 30). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability, as defined by the Act. (*Id.* at 31).

The Appeals Council denied Plaintiff's request for review on November 4, 2014. (R. at 1–3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's

task is "limited to determining whether the ALJ's factual findings are supported by substantial *evidence.*" *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. RELEVANT MEDICAL EVIDENCE

In February 2001, Plaintiff stopped working due to a back injury. (R. at 144). Prior to that time, she had been working as a cashier in retail stores, a fast food worker at a hot dog stand, and a teller at the currency exchange. (*Id*. at 145).

On August 4, 2011, Plaintiff began treating with George Michaels, M.D., at the Access Community Health Network (ACHN) in Chicago, Illinois. (R. at 222). She complained of persistent back pain. (*Id*. at 230). On examination, Dr. Michaels noted myalgias and back pain but no joint swelling or gait abnormalities. (*Id*.). Plaintiff had mild tenderness on the left paravertebral muscle at the lumbar level, but her cervical and musculoskeletal range of motion were normal and she could perform a straight leg raise test above 80° bilaterally.[3] (*Id*. at 231). Dr. Michaels assessed back pain and prescribed Flexeril.[4]

On October 14, 2011, Plaintiff was treated at Mount Sinai Medical Center Emergency Department complaining of back and hip pain that had been getting worse over the prior month. (R. at 248). An examination noted back pain and inflammation but full range of motion, a normal gait, and intact sensation. (*Id*. at 252–53). No mental health issues were complained of or present. (*Id*. at 248, 253). Charles Barron, M.D., ordered X-rays of the pelvis, right hip, and lumbosacral

---

[3] A straight let raising test is used "to determine whether a patient with low back pain has an underlying herniated disk." <https://en.wikipedia.org/wiki/Straight_leg_raise> (last visited October 7, 2016) A normal value would be 80–90°. <http://www.gpnotebook.co.uk/> (last visited October 7, 2016).

[4] Flexeril (cyclobenzaprine) "is a muscle relaxant, . . . [which] is used together with rest and physical therapy to treat skeletal muscle conditions such as pain or injury." <www.drugs.com> (last visited October 7, 2016).

spine. (*Id.* at 246–48). X-rays of the pelvis and hip revealed mild bilateral hip osteo-arthritis with mild superior joint space narrowing and small osteophytes bilaterally along with numerous calcified phleboliths.[5] (*Id.* at 246). The lumbar spine X-ray revealed minimal levocurvature of the lumbar spine and an additional presence of minimal marginal osteophytes. (*Id.* at 247). Dr. Barron diagnosed osteoarthritis of the hip and chronic back pain and prescribed Norco and Ultram for her pain.[6] (*Id.* 255–56).

On January 12, 2012, Plaintiff complained of hip pain after slipping while stepping down from a bus, as well as insomnia and anxiety. (R. at 297). On examination, Dr. Michaels found a normal gait, no tenderness, swelling, deformity, or dislocation of the right hip, no sensory deficits or numbness, and pulses good in all extremities. (*Id.*). While Plaintiff had difficulty performing a right straight leg test, she was able to flex the right hip and knee without pain. (*Id.*). Dr. Michaels assessed right hip pain and osteoarthritis, prescribed Norco and Valium, and referred her to a rheumatologist for evaluation. (*Id.*). On March 30, an X-ray of the right hip and pelvis revealed minimal osteophyte and sclerosis at the superior acetabulum bilaterally. (*Id.* at 304–05). Plaintiff was diagnosed with mild degenerative joint disease in both hips. (*Id.*). On April 4, Plaintiff reported that her hip pain had been minimized by a recent steroid injection from her orthopedist. (*Id.* at 353). She complained of insom-

---

[5] "A phlebolith is a small local, usually rounded, calcification within a vein." <https://en.wikipedia.org/wiki/Phlebolith> (last visited October 7, 2016).

[6] Norco is an opioid pain medication, which contains a combination of acetaminophen and hydrocodone. Ultram (tramadol) is a narcotic-like pain reliever. Both Norco and Ultram are used to treat moderate to severe pain. <www.drugs.com> (last visited October 7, 2016).

nia due to pain and anxiety. (*Id*.). An examination by Dr. Michaels was unremarkable. (*Id*.). He assessed bursitis and arthritis in the right hip. (*Id*.). Dr. Michaels continued Norco and Valium and referred Plaintiff to physical therapy two times a week for six to eight weeks.[7]

On May 17, Dr. Michaels completed a Physician's Report for the State of Illinois, Department of Human Services. (R. at 306–08). He reported that Plaintiff experiences pain in the right hip when walking, sitting, or standing. (*Id*. at 307). He also noted a decreased range of motion in the right hip due to arthritis. (*Id*.). Dr. Michaels opined that Plaintiff's capacity to walk, bend, stand, stop, sit, turn, climb, travel, and general ability to perform activities of daily living was reduced 20–50%. (*Id*. at 308). He further opined that Plaintiff could lift no more than 20 pounds at a time with frequent lifting of up to 10 pounds during an eight-hour day, five days a week. (*Id*.).

On May 18, Plaintiff complained of being unable to perform her daily activities because of right hip pain that is aggravated when sitting, standing, or walking. (R. at 356). Dr. Michaels noted that an X-ray of the left hip showed mild degenerative changes and observed a slow gait due to pain. (*Id*.). He continued Norco and recommended more physical therapy. (*Id*.). On August 2, Plaintiff reported that Norco was effective in relieving her pain and allowing her to move about without any side effects. (*Id*. at 359). Dr. Michaels observed mild tenderness on the right hip joint on

---

[7] Plaintiff did not submit any records of any orthopedic treatment, pain injections, or physical therapy sessions. (*See* R. at 26 n.1).

deep palpitation, with a reduced range of motion and pain while walking. (*Id*.). He assessed right hip arthritis and continued Norco. (*Id*.). On August 21, Plaintiff complained of hip pain and headaches associated with the higher Norco dosage. (*Id*. at 362). An examination was otherwise unremarkable. (*Id*.). Plaintiff reported that she occasionally still took Valium. (*Id*.). Dr. Michael continued to recommend surgery, which Plaintiff declined due to financial difficulties, and lowered the Norco dosage. (*Id*.). On December 18, Plaintiff reported seeing an orthopedist for the arthritis in her right hip. (*Id*. at 365). An examination by Dr. Michaels was unremarkable. (*Id*.). He assessed insomnia and anxiety and continued Norco and Valium. (*Id*.).

On January 17, 2013, Plaintiff reported that physical therapy had reduced the pain in her right hip. (R. at 368). However, she complained that Valium was no longer helping, and she was experiencing anxiety attacks. (*Id*.). She denied suicidal ideations. (*Id*.). Dr. Michaels assessed anxiety and prescribed Xanax. (*Id*.).

On March 28, Plaintiff presented to Mt. Sinai Hospital Emergency Department after experiencing a fall four days when her right hip locked on a set of stairs. (R. at 311–16). Plaintiff reported left shoulder, lumbar, and right hip pain and occasional dizziness since the fall. (*Id*. at 313). She denied vomiting, blurred vision, seizures, and confusion; she exhibited a normal, steady, gait, and had full range of motion in all joints. (*Id*. at 313, 315). She also denied any mental health issues. (*Id*. at 313). X-rays of the hip and lumbar spine showed no acute bony pathology and a stable appearance of the right hip since the previous imaging. (*Id*. at 311–12). There were signs of small marginal osteophytes and endplate degenerative change. (*Id*. at 312).

Sarah Rowe, M.D., diagnosed acute lower back pain and right hip arthritis. (*Id.* at 316).

On June 3, 2013, Plaintiff complained of blurred vision, dizziness, and a numb sensation at the top of her head since the March 2013 fall. (R. at 373, 379). Plaintiff also reported insomnia, a dysphoric mood, decreased concentration, depression, and anxiety. (*Id.*). On examination, Dr. Christine Veres, M.D., found that Plaintiff was alert, well oriented in person, place, and time, and in no distress. (*Id.* at 380). Plaintiff has a normal mood and affect, and her behavior, judgment, and thought content are all normal. (*Id.* at 381). No behavioral problems or confusion were present. (*Id.* at 379). Dr. Veres continued Xanax but discontinued Paxil due to side effects. (*Id.* at 376). On July 2, Plaintiff exhibited anxious symptoms but her physical examination was unremarkable. (*Id.* at 386–87). She was assessed with anxiety and insomnia, for which she was prescribed Xanax and Elavil. (*Id.* at 387).

On October 29, 2013, Plaintiff had an appointment with Nasreen Ansari, M.D., at ACHN. (R. at 398). She was prescribed Zolpidem as treatment for insomnia and Amitriptyline as treatment for depression. (*Id.* at 397, 399–400).

## A. Disability Determination Services

On December 17, 2011, Nicholas D. Kokonis, Ph.D., performed a psychological consultative examination for the Disability Determination Services (DDS). (R. at 257–61). Plaintiff stated that she was unable to work because of osteoarthritis, anxiety, and insomnia. (*Id.* at 257). During the examination, Plaintiff, who was accompanied to the examination by her adult daughter, ambulated freely, evidenced a

good ability to attend and concentrate, and remained seated without complaining of any pain. (*Id.*). Plaintiff reported no history of psychiatric treatment or medication use. (*Id.*). On examination, Plaintiff was tense, but her mood was normal without any measurable evidence of clinical depression or anxiety. (*Id.* at 258). Her speech, thought process, orientation, memory, concentration, calculation, abstract thinking, and judgment were all intact and normal. (*Id.*). Plaintiff's daughter reported that Plaintiff works around the house, shops independently, prepares a simple meal for herself, and performs household chores that do not require too much energy. (*Id.* at 260). Dr. Kokonis diagnosed adjustment disorder with anxiety and assigned a Global Assessment of Functioning (GAF) score "above 70."[8]

On December 29, 2011, Howard Tin, Psy.D., a nonexamining DDS doctor, reviewed the record and completed a Psychiatric Review Technique form and a mental RFC assessment. (R. at 262–79). He found some inconsistencies in Plaintiff's activities of daily living and concluded that she was only partially credible. (*Id.* at 274). Dr. Tin opined that Plaintiff's adjustment disorder with anxiety would cause mild restrictions in activities of daily living and moderate difficulties in maintaining

---

[8] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) (hereinafter *DSM–IV*). A GAF score of 71–80 indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument), with no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork). *Id.* at 34. The Court notes that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013); s*ee Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (recognizing that the American Psychiatric Association abandoned the GAF scale after 2012).

social functioning and maintaining concentration, persistence, or pace. (*Id.* at 267, 272). Dr. Tin further concluded that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.* at 276–77). On April 13, 2012, R. Leon Jackson, Ph.D., affirmed Dr. Tin's opinion. (*Id.* at 301).

On January 3, 2012, James Madison, M.D., a nonexamining DDS doctor, examined the record and completed a physical RFC assessment. (R. at 280–87). He concluded that Plaintiff has mild lumbar spondylosis and mild bilateral hip osteoarthritis with joint space narrowing but has a normal gait and range of motion. (*Id.* at 281). Dr. Madison found Plaintiff was only partially credible when describing her difficulty squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing. (*Id.* at 285). He opined that Plaintiff's mild arthritis, back pain, and mild spinal area tenderness would limit her to a range of light work. (*Id.* at 281–82). These findings were affirmed on April 23, 2012, by Charles Wabner, M.D., a nonexamining DDS doctor. (*Id.* at 301).

## B. Plaintiff's Testimony

In a disability report dated September 15, 2011, Plaintiff asserted that she suffered from severe anxiety, back pain, high cholesterol, irregular heartbeat, hip pain, and rheumatoid arthritis. (R. at 144). In an adult function report dated September 29, 2011, Plaintiff reported she suffers from insomnia due to anxiety and pain. (R. at 168). Plaintiff can very occasionally make simple meals that take less than 10 minutes. (*Id.* at 169). She can clean for short periods with a lot of rest and encouragement. (*Id.*). Because Plaintiff has trouble concentrating, she no longer paints or reads. (*Id.* at 171). She also has a hard time being social due to depression and anxiety. (*Id.* at 172). Plaintiff claims that squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing worsen the constant pain in her shoulder, back and hip. (*Id.*). Depression and anxiety worsen her ability to concentrate, follow instructions, and complete tasks. (*Id.*).

In a January 25, 2012 disability report, Plaintiff claimed that the pain in her shoulder, back, and hip had worsened. (R. at 178). She reported severe insomnia and fatigue; she noted she is unable to walk, sit, lie down, or lift objects due to her arthritis; she complained of heart palpitations, severe sweating, weakness, nausea, and migraines. (*Id.*). She stated she has a hard time leaving her home due to severe anxiety. (*Id.* at 182).

In an additional adult function report completed on March 6, 2012, Plaintiff noted she feels constant pain and anxiety, and while medication helps, it also makes her feel very tired. (R. at 185). She now reports that she eats only once a day and

can spend no more than five minutes making a meal. (*Id.* at 187). Plaintiff estimates leaving the house only three days a week for short periods. (*Id.* at 188). She states that she cannot walk more than two blocks without feeling shooting pain. (*Id.* at 190). Plaintiff also asserts that her ability to memorize and concentrate have gotten worse. (*Id.*).

On May 30, 2013, Plaintiff testified that she arrived by public transportation with her mother because she experiences anxiety when traveling alone. (R. at 42). Since her fall in March 2013, she has been experiencing numbness, headaches, and insomnia. (*Id.* at 43). She reports severe pain in her hips and back, states that most painkillers have stopped working so she uses over-the-counter medicine such as Advil, Tylenol, and Aleve, which only help moderately. The severity of pain and anxiety make it difficult for her to sleep more than a few hours a week. (*Id.* at 44, 46). Her treating physicians have recommended physical therapy, orthopedic surgery, and psychiatric help, but she cannot afford those forms of treatment. (*Id.* at 51).

Plaintiff testified that the pain in her hip and back gets worse when standing for long periods of time. (R. at 48). When asked about a sedentary job, Plaintiff said she would struggle with concentrating. (*Id.*). When doing household chores, Plaintiff must constantly reposition herself to prevent putting too much pressure on her hip. (*Id.*). Plaintiff states that her depression and anxiety have increased greatly. (*Id.* at 57). For example, just taking the bus home makes her anxious and fearful. (*Id.*). She feels she needs a psychiatrist but does not have the money to pay upfront for mental help. (*Id.*). She is unable to do more than light cooking or cleaning; typically,

she goes grocery shopping only with her mother or daughter; she cannot carry anything heavy; she can take care of her personal needs; and she spends most of her day flipping through television channels and talking to friends on the phone. (*Id.* at 60–62).

# V. DISCUSSION

## A. The ALJ's Credibility Determination is Not Patently Wrong

The Social Security Administration determined recently that it would no longer assess the "credibility" of a claimant's statements, but would instead focus on determining the "intensity and persistence of [the claimant's] symptoms." Social Security Ruling (SSR) 16-3p, at *2.[9] "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original).

The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could

---

[9] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administering." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2; *see also* 20 C.F.R. § 416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." SSR 16-3p, at *2.

In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 16-3p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 16-3p, like former 96-7p, requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms

and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted). "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Id.*

Plaintiff testified that she is unable to work because of severe pain in her hips and back. (R. at 44, 46). She asserted that most painkillers have stopped working so she uses over-the-counter medicine, which only help moderately. (*Id.*). The severity of pain and anxiety make it difficult for her to sleep more than a few hours a week. (*Id.*). Her treating physicians have recommended physical therapy, orthopedic surgery, and psychiatric help, but she cannot afford those forms of treatment. (*Id.* at 51). Plaintiff testified that the pain in her hip and back gets worse when standing for long periods of time. (*Id.* at 48). When doing household chores, Plaintiff must constantly reposition herself to prevent putting too much pressure on her hip. (*Id.*). She is unable to do more than light cooking or cleaning; typically, she goes grocery shopping only with her mother or daughter; she cannot carry anything heavy; she can take care of her personal needs; and she spends most of her day flipping through television channels and talking to friends on the phone. (*Id.* at 60–62).

In his decision, the ALJ found that Plaintiff's allegations "are not entirely credible." (R. at 28). Specifically, the ALJ found Plaintiff's statements not credible because (1) her pain was managed with a combination of over-the-counter pain medication, pain injections, and physical therapy; (2) she demonstrated a steady gait and negative straight-leg-raising tests; (3) she is able to use public transportation, prepare simple meals, and complete simple household chores; and (4) she had no complaints of pain during her last treatment visit. (*Id.*).

The ALJ supported his credibility determination with specific findings and substantial evidence. The objective evidence cited by the ALJ demonstrates that Plaintiff walks with a normal gait and has full range of motion in her legs. (R. at 230–31 (in August 2011, Plaintiff's gait and cervical and musculoskeletal range of motion normal and she could perform a straight-leg-raise test above 80° bilaterally), 253 (in October 2011, Plaintiff had full range of motion in all joints, a normal gait, and intact sensation), 257 (in December 2011, Plaintiff ambulated freely and remained seated during consultative examination without complaining of pain), 297 (in January 2012, Plaintiff had normal gait, could flex right hip and knee without pain, and reported no numbness or sensory deficits in any extremity), 314 (in March 2013, Plaintiff exhibited a normal gait, full range of motion in all joints, and exhibited no point tenderness in the spine), 379 (in June 2013, Plaintiff exhibited a normal gait and no joint swelling; *accord id.* at 23–28 (evidence cited by ALJ)). Thus, as the ALJ concluded, while Plaintiff "no doubt experienced some limitations from her hip osteoarthritis, the evidence . . . shows that she is able to perform light work." (*Id.* at

28); *see* 20 C.F.R. §§ 404.1529(c)(4) (inconsistent testimony or medical evidence can be used by the ALJ to undermine a claimant's statements about the intensity, persistence, and limiting effects of her symptoms), 416.929(c)(4) (same).

Plaintiff contends that the ALJ failed to acknowledge that her osteoarthritis could reasonably produce her alleged pain. (Dkt. 13 at 7–8). To the contrary, the ALJ explicitly found that Plaintiff's arthritis of the hip and back were severe impairments, which "could reasonably be expected to cause some of the alleged symptoms." (R. at 22, 28). The ALJ further acknowledged that Plaintiff experienced some pain from her arthritis but determined—after examining the whole medical record—that her symptoms of hip pain did not "occur[ ] with such frequency, duration, or severity as to preclude work activity on a continuing and regular basis." (*Id.* at 29).

The ALJ also relied on the fact that Plaintiff's pain has been alleviated with medication and treatment. (R. at 353 (in April 2012, Plaintiff reported that her hip pain had been minimized by a steroid injection), 359 (in May 2012, Plaintiff reported that Norco was effective in relieving pain and allowing her to ambulate freely), 368 (in January 2013, Plaintiff reported that physical therapy had reduced her hip pain)). Plaintiff asserts that the ALJ failed to take into account that her "lack of insurance prevented her from seeking medical attention and could explain her pursuit of only conservative treatment on an infrequent basis." (Dkt. 13 at 9–11). But the ALJ acknowledged that Plaintiff had financial challenges funding her treatments. (R. at 26–27 (ALJ reporting that Plaintiff "declined to seek treatment with an or-

thopedic surgeon due to lack of funding"), 27 (ALJ acknowledging that Plaintiff testified that she was "unable to follow up with this treatment due to lack of funding")). And the ALJ's emphasis on conservative treatment was because *Plaintiff* reported that her pain was managed by pain medications, pain injections, and physical therapy.[10]

Further, at the hearing, Plaintiff acknowledged that she needed only over-the-counter medication to manage her hip pain. (*Id.* at 44). The fact that Plaintiff relied on over-the-counter analgesics, which gave her some relief, allowed the ALJ to properly infer that Plaintiff's level of pain was not severe. *See Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002) ("Then the ALJ noted that Donahue relied for pain control on over-the-counter analgesics and reported that these gave him good relief, from which the ALJ inferred that the level of pain could not be severe."); *Jacoby v. Barnhart*, 93 F. App'x 939, 943 (7th Cir. 2004) (properly discounting allegations of pain where claimant "used only aspirin to manage his pain"); *Simpson v. Barnhart*, 91 F. App'x 503, 507 (7th Cir. 2004) ("The ALJ was free to infer that Simpson's pain was not severe because he was never prescribed pain medication and testified that he was able to control his pain symptoms by taking Tylenol.").

Plaintiff contends that she was taking over-the-counter medications to treat her ailments because the prescription medicines "failed to provide significant and last-

---

[10] Even if the ALJ gave short shrift to Plaintiff's financial obstacles, his credibility analysis is otherwise supported by substantial evidence, as discussed herein. *See Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) ("But the standard of review employed for credibility determinations is extremely deferential, and the ALJ did provide some evidence supporting her determination.").

ing relief." (Dkt. 13 at 11–12). But as the ALJ noted, and the evidence indicates, despite taking only over-the-counter pain medications, Plaintiff "demonstrated a steady gait and negative straight leg raising tests throughout the relevant time period . . . [and] was able to use public transportation, prepare simple meals, and complete simple chores." (R. at 28). And by July 2013, two months after the hearing, Plaintiff did not have any complaints of pain despite not taking prescription pain relievers. (*Id.* at 384–88).

Plaintiff's activities of daily living also belied her complaints of debilitating hip pain. Despite testifying to being unable to stay on her feet for very long, she acknowledged being able to use public transportation, shop, and perform simple household chores. (R. at 42, 44, 46, 48, 60–62). She admitted to Dr. Kokonis that she can cook and clean. (*Id.* at 257). Similarly, Plaintiff's daughter told Dr. Kokonis that Plaintiff is able to shop independently and "works around the house" handling chores "that are not too energy consuming." (*Id.* at 260). In sum, as the ALJ found, "the objective medical evidence fails to document the presence of any impairment or combination of impairments that could reasonably be expected to result in pain or other symptoms of such a severity or frequency as to preclude all work." (R. at 29).

Plaintiff argues that her minimal daily activities do not provide substantial support for the ALJ's light work RFC. (Dkt. 13 at 13–14). While it is permissible for an ALJ to consider a claimant's daily activities when assessing credibility, the Seventh Circuit has repeatedly admonished ALJs not to place "undue weight" on those activities. *Moss,* 555 F.3d at 562; *see Punzio v. Astrue,* 630 F.3d 704, 712 (7th Cir. 2011)

("[The claimant's] ability to struggle through the activities of daily living does not mean that [the claimant] can manage the requirements of a modern workplace"); *Mendez v. Barnhart,* 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."). Here, the ALJ was not basing his RFC on Plaintiff's ability to perform activities of daily living. Instead, he properly found that Plaintiff's daily activities undermined her claim of debilitating back and hip pain.

Under these circumstances, the Court cannot conclude that the ALJ's credibility determination was patently wrong. The ALJ supported his decision with specific findings, supported by substantial evidence. *Moss*, 555 F.3d at 561.

## B. Substantial Evidence Supports the ALJ's Determination that Plaintiff Can Perform a Limited Range of Light Work

The ALJ determined that Plaintiff's arthritis of the hip and back, depression, and anxiety are severe impairments. (R. at 22). After examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that Plaintiff has the RFC to perform light work,[11] except that she "can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can

---

[11] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

occasionally balance, stoop, kneel, crouch, and crawl; can understand, remember, and carryout simple work instructions and execute simple workspace judgments; can perform routine work that involves occasional changes and decision making and can only occasionally interact with the general public." (*Id.* at 24). Plaintiff contends that the ALJ erred in this determination when he gave great weight to the nonexamining state-agency doctors. (Dkt. 13 at 8–9).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); SSR 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported

symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

After carefully examining the record, the Court finds that the ALJ's determination of Plaintiff's RFC was thorough, thoughtful, and fully grounded in the medical evidence. There is no prohibition on the ALJ relying on the opinions of nonexamining doctors.[12] *See Collins v. Barnhart*, 114 F. App'x 229, 233 (7th Cir. 2004) (ALJ "appropriately relied on the nonexamining source opinion"); *Ronning v. Colvin*, No. 13 CV 8194, 2015 WL 1912157, at *5 (N.D. Ill. Apr. 27, 2015) (ALJ may reasonably rely on DDS report); SSR 96-6p, at *3 (opinions from state-agency doctors may be entitled to the most weight). Plaintiff complains that the state-agency doctors did not have the benefit of later-submitted evidence (Dkt. 13 at 8–9) but fails to acknowledge that the ALJ reached the same conclusion. Indeed, the ALJ explicitly noted that the state-agency doctors' opinions were "consistent with the evidence of record *at the time of their reviews* . . . [but] that evidence submitted subsequent to their review *shows further limitation* of function." (R. at 29) (emphasis added).

There is also no requirement that the ALJ submit this later-submitted evidence to a medical expert for review. (*See* Dkt. 13 at 9) (Plaintiff asserting that "[t]he ALJ failed to arrange for a review by a medical expert [because] no medical opinion evi-

---

[12] Plaintiff contends in her Reply that she was also challenging "the ALJ's explanation for rejecting Dr. Michael's opinion." (Dkt. 20 at 2–3). But Plaintiff's opening brief does not raise an argument about the weight given to her treating physician. (Dkt. 13 at 7) (challenging only the ALJ's "evaluation of Plaintiff's pain, RFC and credibility"). And it is well settled that parties waive arguments raised for the first time in a reply. *See, e.g., Argyropoulos v. City of Alton*, 539 F.3d 724, 740 (7th Cir. 2008); *Empire Elecs., Inc. v. D&D Tooling & Mfg., Inc.*, No. 13 C 376, 2014 WL 5819728, at *6 (N.D. Ill. Nov. 10, 2014).

dence supported his findings after the nonexaminer's review in April 2012."). To the contrary, the determination of a claimant's RFC is an issue reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). In determining the RFC, "an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). Indeed, "the SSA need not accept only physicians' opinions; . . . if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict." *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). "That is not, as the plaintiff protests, 'playing doctor;' it is being a judge." *Rogers v. Barnhart*, 446 F. Supp. 2d 828, 856 (N.D. Ill. 2006).

Plaintiff also contends that the ALJ failed to evaluate her insomnia and how that condition, along with her pain, anxiety, and depression, affects her ability to concentrate on a sustained basis or maintain an absence-free schedule. (Dkt. 13 at 12–13). She argues that while "the ALJ mentioned [her] insomnia in summarizing the medical records, he failed to consider that evidence and [her] testimony in his evaluation." (*Id.* at 12). But "an ALJ's credibility findings need not specify which statements were not credible." *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); *see Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003) (rejecting the notion that an ALJ must "specify which statements were incredible"). And the ALJ noted Plaintiff's occasional complaints of insomnia, depression, and anxiety (R. at 23, 25, 26,

27) but concluded that they did not occur "with such frequency, duration or severity as to preclude work activity on a continuing and regular basis" (*id.* at 29).

Further, the ALJ's RFC limits Plaintiff to simple work instructions, simple workspace judgments, routine work, only occasional changes and decision making, and only occasional interactions with the public. (R. at 24). It is Plaintiff's burden to establish that her insomnia prevents her from working. *Clifford*, 227 F.3d at 868. And she has not identified any medical evidence or medical opinions that precludes her from such simple work because of her insomnia. To the contrary, the state-agency psychiatrist, to whom the ALJ gave great weight (R. at 28), diagnosed adjustment disorder with anxiety (*id.* at 267), acknowledged Plaintiff's insomnia (*id.* at 274) and found that Plaintiff has difficulty maintaining attention and concentration, but concluded that she is capable of performing simple tasks (*id.* at 278); (*see also id.* at 259, 260) (consultative examiner finding that Plaintiff exhibits good concentration skills despite claims of insomnia).[13]

---

[13] Plaintiff also asserts that the ALJ's hypothetical questions to the VE "failed to incorporate all of Plaintiff's exertional and nonexertional limitations." (Dkt. 13 at 14–15). But the ALJ's hypothetical questions are consistent with the ALJ's RFC determination. (*Compare* R. at 65, *with id.* at 24). And as discussed above, the ALJ's credibility determination and RFC analysis are supported by substantial evidence.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment [14] is

**DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is af-

firmed.


E N T E R:

Dated: November 7, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge